Our first case, Mr. Fischer. May it please the court. I'm Clark Fischer of the Ashe County, North Carolina Bar, representing the appellant Keith Vinson. Mr. Vinson appeals his convictions of conspiracy to commit bank fraud, defrauding the United States, money laundering, and other related economic crimes, which resulted in a sentence of 216 months, which I would note, and will try to discuss this morning, is about five times greater than any other co-defendant in this case. The principal issue I'd like to discuss this morning is whether there was sufficient evidence of wrongdoing on the part of Mr. Vinson, I think there's some perverberation there, if I can move that back, to submit the case to the jury at all. Our position emphatically is that there was not, and what the government proved was that in the days around the economic crash of 2008, there were plenty of bankers that wanted to throw good money after bad, and there was ample evidence of that in this case, but no evidence sufficient of criminal wrongdoing on the part of Vinson to submit the case to the jury. If that's your argument, why did you object to an instruction on willful blindness? Well, Your Honor, at that point, the judge had denied our Rule 29 motion. We're going through the charge conference, and certainly I did contend, perhaps not as vehemently as I could have, but we did object that willful blindness was not appropriate on the case, and I will try to discuss that a little bit later, if time allows. In order to fully understand what this case is about, you've got to briefly consider the business environment in which they arose. All the charges relate in one way or another to the Seven Falls development. Planned before the crash, that was supposed to be a high-end golf development in the Henderson County area of North Carolina, near Asheville. Now, where's that from, Asheville? Is that just outside of Asheville? Asheville, Your Honor, apparently a very beautiful area. And, of course, that was an area, a time when Asheville was- When they were going to build a golf course and put fancy homes around it. That's exactly right, Your Honor. There were several other high-end developments in the area, and this was going to be another one. You can use your time any way you want, but you can be pretty sure we know the facts. Okay. Thank you very much, Your Honor. Then what I would like to point out, I think relevant to the consideration of the sufficiency of the evidence argument, is that one of the factors that the government argued was somehow evidence of wrongdoing in this case was that these loans, be it at the initial sale, the Founder's Day event, or later, were 100 percent financing. There was a lot of testimony at trial about how that was just bad banking practice because bankers should want borrowers to have skin in the game. That was the phrase that was used. Is this related to a particular count? That really underlies the conspiracy to commit bank fraud, Count 1, Your Honor, as well as several of the others, all of which, or many of which, go to the specific financing of Southern Falls. I would just ask the Court to consider, both from your own knowledge and throughout the case, that 100 percent financing prior to the crash was very common. There was testimony from the National Bank of South Carolina, the initial lender's officers, that was Ms. Stagg and Ms. Cash, that the bank knowingly accepted the risk of 100 percent financing. The Bank of Asheville, one of the leading institutions involved in this case, credit officer said, we certainly can make 100 percent financing loans. But the problem is not the 100 percent financing. The problem is the number of loans made to, it appears, to circumvent the per-person loan limit. It's not the extent of the financing. Well, Your Honor, I think the 100 percent financing was part of it. Certainly, you are correct that that was another aspect of the government's case. And I would argue that circumvent is really not the accurate term from the evidence that we had before you. The contracts, the initial contracts, all provided for a 25 percent purchase credit, meaning if you bought it for $800,000, you're really financing six. That was both at the initial sales and the later sales, this lot loan program, as the government called it. That was really the biggest part of Counts 1 and Count 2. I don't believe there was any evidence, Your Honor, and this is really one of our contentions, that Keith Vinson had any clue whatsoever about loan-to-one borrower limits or loan-to-value laws. That was the bank's problem. That is exactly right, Your Honor. That's the bank's problem. How could you expect the developer, who's over here trying to get the roads built and do the grading and all the things that go into a development like this, be expected to know that the bank's loan-to-one borrower limit was 15 percent of unimpaired capital? I certainly had no idea about this until I learned it from the checks. Wouldn't he be expected to know how much money he had in an account that he was writing checks on? No. Absolutely right, Your Honor, and there certainly was a count about a bad check, a big bad check, $400,000, I believe it was. And I think to show where I would contend what this case is about is it was the bank's, not Vinson. You look at the credit memo from the Bank of Asheville about what they did about that bad check. You're right. He certainly should have known, just like we all should know, what's in our checking account. He wrote the check. The bank had every option just to kick it back in itself. But what they did – Well, actually, it was approved initially by his co-conspirator, Greenwood, even though the loan amount exceeded Greenwood's authority to approve. It absolutely was approved by President Greenwood of the Bank of Asheville, who approved many of these transactions along with the chief credit officer, Mr. Hamrick of the bank, and in many cases the loan committee. But going back to – The loan committee subsequently, and we have to take the evidence in the light most favorable to the government, approved the loan because it proceeded on the hope, which later turned out to be unsubstantiated, that it might be able to recover. That's exactly right. Because the loan had already been made. Well, they covered the check, and that clearly exceeded Greenwood's authority. There was testimony to that effect. How Mr. Vinson is supposed to know what Greenwood's internal authority is, is a mystery. There was no evidence whatsoever of anything other than casual conversations between Keith Vinson and Mr. Greenwood about anything. We quoted in our sentencing memorandum that's in the appendix Mr. Greenwood stating, I just thought Keith Vinson was going to be a good customer for the bank, and I didn't conspire with him. But going back to your initial question, Judge Duncan, there was a credit memorandum done by Mr. Greenwood, approved by Mr. Hamrick, sent to the loan committee about that $400,000 bad check, which the bank wanted to somehow get off its books. And in that credit memorandum, that was Government's Exhibit 306, states that the bank feels it's best to continue to work with Keith and help him through this difficult time. The real estate markets will eventually come back. Again, there's no deception there, but bottom line, that was up to the bank to do that. There was zero evidence whatsoever in this record anywhere, all 10,000 or 11,000 pages, whatever it is, that Keith Vinson put any pressure, coerced, even had a communication with Mr. Greenwood about this. The bank did that, like the banks did so many things in this case, to clean up their books. And I think that credit memorandum is very important as you consider the evidence in this case, even in the light most favorable to the government. Was Vinson the only one that ever went to trial? That is correct, Your Honor. How many others were convicted? In our particular indictment, Your Honor, I recollect seven or eight. There were probably 12 or 15 others. You were arguing about the sentence. I'm getting ahead of myself here. Yes, sir. You were arguing about that sentence. It was too much compared to others. How many others are there that you put in that category? Overall, Judge, in my recollection, there were probably about 15. Fifteen? Yes, sir. How many of them were within the bank? Within the bank, there was Mr. Gourlay, there was Mr. Durham, there was Mr. Greenwood. I don't know that any of them were there. Five or six. Five or six. Five or six, Judge. Kind of jumping ahead, Judge. There were a lot of prosecutions. There certainly were. He wasn't just your guy. He wasn't just the only one that was picked on. No, no, not at all, Your Honor. He was the only one that was innocent, your man. Excuse me, Your Honor? Your man was the only one that was innocent. Well, I like to think so, Your Honor, though I'm really not sure about Mr. Cashin or Chapman either. But, of course, when you have— Did everyone else plead? Everybody else pled, Your Honor. Usually, not too many innocent people plead and not 14 others. Well, Your Honor, I'm not so sure I would agree with that.  Oh, really? No, ma'am, I would not. Well, they were forced into pleading guilty? I think— Is that what you're saying? I don't—well, we can say force. As a criminal defense attorney, when you are representing somebody who is facing what they were facing— They pled him guilty to get him out from under everything. Excuse me, Your Honor? They pled him guilty to get him out from under all these other charges and then not end up in the penitentiary for the rest of them. They made the deal. That's right, Your Honor. Was any of them Alford pleas or no low contendery pleas? I am not aware of anybody doing an Alford plea in this case. Okay. But there were pleas of guilty and other folks were sentenced. And your man was the only one who went to trial. That's right. And he got convicted and he got a heavier sentence. That's correct, Your Honor. But it's still below the guideline range, as I recall. It was below the guideline range. So it's presumptively reasonable. Presumptively reasonable. That's correct, Your Honor. But, of course, 3553 says we look at a number of factors, including the other similarly situated. And what makes them similarly situated if they all pled, if all the others pled out? Well, I think similarly situated or arguably more culpable than Mr. Benson, assuming guilt. My question was what makes them similarly situated if all the others pled out and didn't put the government to the burden of proof in going to trial? Judge, the guidelines appropriately allow acceptance of responsibility and sometimes substantial assistance if you do just that. But we also consider in the pre-sentence report for the sentencing judge the facts of the case, what the relative roles of the parties were in this case. Certainly, I point to Cashin and Chapman, the investors of the group, that dealt probably more with Benson than anybody else. Cashin and Chapman, on the eve of trial, because quite frankly, Judge, kind of going back to the situation we were in, we were expecting everybody to go to trial on our indictment until the weekend before trial when everybody else rolled and we were there by ourselves. Some of them caved in on you. And a bunch of them testified against you. Well, the main one in our indictment that testified against us was Cashin. That's correct, Your Honor. Cash? Cashin. Avery Cashin. Buck Cashin? Buck Cashin. That's the one, Your Honor. We had a case involving him, I think, earlier. I don't know. Judge, I don't believe that. I remember that name. Well, basically, he and Mr. Chapman pleaded in on something that gave them a five-year cap in the matter, and they both got 36-month sentence. But, again, jumping ahead, our position is to the similarly situated argument, Judge Duncan, is that it was Cashin. That's the old accounting rule. FIFO. Criminal defense lawyers and prosecutors know about that. FIFO. First in, first out. That is correct, Your Honor, and one would like to think that our sentencing rules and guidelines are a little more flexible than that. But it's certainly a consideration. It's a time-honored way things work in the criminal system. That is correct. The people get in there and help the government get a break. And they do get a break, and they should get a break. And I'm not saying Keith Vinson shouldn't get a break. Guidelines take it into account. And clearly it did. However, if I may, the reality is from the evidence that Judge Rydiger had before him, it was Cashin, mostly. But even, let's assume, let's assume that you're absolutely correct, that there was all this bad stuff going on, the banks were doing bad things, Cashin, everybody around Mr. Vinson was doing bad things, and he was purer than the driven snow. All you're doing is begging the question, why wouldn't a willful blindness instruction be appropriate, given the miasma of evil around him that he somehow managed to be blissfully unaware of? Because, Judge Duncan, the willful blindness that, in this case, goes to being blind as to the violations of banking regulations and laws. No. No. Not necessarily. I mean, he helped place numbers of loans with numbers of people that involved kickbacks to stay under the loan per person limit. Judge, I would dispute that characterization of either Vinson's actions or kickbacks. If you're referring to the interest carry provisions as a kickback, that was done both at the start, this first Founder's Day event, the National Bank of South Carolina program, everybody knew about it. When you go to these lot loans that were the subject of Counts 1 and 2 and some of the other counts of the indictment, they were clearly set forth in the contracts. A kickback is secret. A kickback is something you don't know about. There wasn't any kickback in this case by Mr. Vinson because he's telling everybody about the interest and the borrower's fees. It's an investment decision. Except bank officers who had a loan per person limit that grouping the loans did not trigger, since you don't care for the word circumvented. Well, Your Honor, clearly I don't care as for Vinson the use of the word circumvented. That's a word that came from Mr. Cashin. Buck Cashin, again, when he talked about the Pisgah loans. That was a word that Mr. Cashin used on the witness stand? That is correct. He first said... So it was a word that the jury could consider? That is correct, Your Honor. And where that word came from, knowing Buck Cashin, I'd be surprised... Were you trial counsel? I was, Your Honor. Well, you had an opportunity to just show that that was inappropriate and wrong and persuade the jury. Well, I like to think, Your Honor, that we pointed out in cross-examination, this is quoted in our brief and we're leaving the transcript. I'm sure you did. And the jury was not persuaded? That's right, Your Honor. You argued he was lying? I argued that if you look at all the evidence of that transaction, what Mr. Cashin went on to say, consistent with Mr. Gourlay, the bank officer from Pisgah who testified, was that Cashin went to the bank and pitched, we want to do a $2.5 million acquisition and development loan. What the bank did was say, we can't do that, but the bank suggested that we break it up into six lot loans. Cashin then went back to Vincent. Again, this is... So you had a shot at, you presented your theory of the defense at the trial, and you got to argue that theory that you just argued with us. Clearly. So you had a shot at trying to convince the jury that this was all, as far as your client was concerned, innocent behavior. That's correct, Your Honor. And the jury resolved it against you, and that's the reason you're up here. But you had a shot. It wasn't like you were foreclosed. No, I'm certainly not going to say we... From making that argument and saying that Cashin misconstrued it or misstated it, that he's made a sweetheart deal and all that stuff, and he can't be believed, he's a co-conspirator, he's a bad guy. My man's a good guy. You did all that. Your Honor, we did, but I see my time is up. You can answer my question. I'm sure Judge Mott's going to... Yeah, you can answer it. My point, Judge, is that given the rest of the evidence where Cashin said that the idea to do the loans this way didn't come from him to circumvent anything, wasn't part of a plan with Vincent, the bankers suggested it, he went back to Vincent and Vincent said... Greenwood suggested it. Greenwood... We're at a different bank, Your Honor. This is at Pisgah Community Bank. President Durham and Chief Financial Officer Gourlay suggested it, and there was Gourlay even testifying, and this is why we say it shouldn't have been submitted, that he had no communication with Vincent about Vincent wanting him to lie or misrepresent anything. Thank you very much. Thank you very much. Hear from the government. Ms. Ray? Ms. Ray? It's always a pleasure to see you, Ms. Ray, but I think we've got a pretty firm handle on this case. Then I'm happy to submit. I was simply going to give a few of our best points in terms of the evidence, but... No, you go ahead. If Your Honors don't have... I'm good. If Your Honors don't have any questions. Judge Duncan? Yes, you look like you have questions. I'm fine. You look like perhaps you would. I mean, I think I'll say this much. I think that some of our best evidence were e-mails, and this is a gentleman who used other people for sure to accomplish his objectives, but the totality of the evidence was that in Cashen's testimony was very powerful, that Keith Vinson was the head honcho, that they borrowed money that was not theirs, and that they knew it was wrong. But the bankers were involved in it, too. Absolutely. How many different banks? We put on evidence of three different banks, but really just two that were colluding. Old Town Bank they used as lot loans. How many co-conspirators played guilty? Eleven. I think eleven. How many cooperated and didn't play guilty? In terms of others who, I mean, I think we prosecuted everyone that we felt were criminally liable, and all of them played guilty. So you prosecuted all the criminals? You didn't let any of them walk? I don't know that. I wouldn't say that we let anybody that we thought we could prosecute successfully walk. There's always the gray areas where you're not sure you think that perhaps, but we went forward with these eleven. And we, well, twelve, saying Keith Vinson was the only one who went to trial. And what was the longest sentence other than Mr. Vinson? I was just, I'm sorry, I don't have the answer to that, Judge King, actually. I think Buck Cashins was probably the longest other than his, and I don't, I just looked at the PSR and it hadn't been sentenced. Well, we can figure that out in the records. Yeah, but certainly Keith Vinson's was longest by a substantial amount. Just a couple of factors. He was the leader. Judge Reidinger described him as the head of the pyramid. He actually had a history of some deceptive criminal conduct, so he had a criminal history. How many prior felony convictions did he have? I don't think. He had one grand theft. I don't know if that was felony. I'm assuming it was. And other than that, they were worthless checks. Modulant behavior. Right. But it was deceptive behavior. This wasn't the first time he had been in a criminal court for engaging in deceptive behavior that was criminal. And then in addition to that, I mean, Keith Vinson was involved in every single one of these schemes, and it ran the gamut. Not everyone was involved in every single scheme from the Ziger loan, excuse me, to the Worland loan, to the Burnett loan, to the Lott loan, to Queen's Gap. He was the only one. I'm sorry, Judge Duncan. No, please. He was the only one involved in Queen's Gap. I mean, I think the government's case is overwhelming, and the willful blind instruction, of course, was appropriate exactly for the reasons that Mr. Fisher was arguing, which is that Keith Vinson, there wasn't a whole lot of evidence that there was direct contact between him and some of the bankers, but we do have him introducing cash into Greenwood, and we have his agents constantly in contact with the bankers. So, yes. As I recall, one of the things that influenced the judge in sentencing was the magnitude of the harm. Absolutely, yes, which was over $10 million just with the Lott loans alone, and two banks closed. I mean, this was a fraud, schemes to defraud that while everyone might have been trying to prop up this development that they thought would succeed in a difficult financial environment, and undoubtedly it was, these are folks who didn't know, who were using that situation to continue to get money that was not properly theirs. And it went on and on and on, and there were bankers who were trying to hold on, and Greenwood, I think, was mostly entirely culpable, but understood the ramifications if this thing fell apart. And so, you know, many bad acts in an effort to prop up a development that was going to fail, and cost a lot of people a lot of money and closed two banks. If your honors don't have further questions, thank you. Do you have any rebuttals, sir? I would agree with what Ms. Ray just said, that Mr. Greenwood was certainly a primary bad actor here. Throughout the Bank of Asheville, he approved bad checks, he sent loans, he didn't tell the Loan Committee what was going on, in some cases, though in many cases he did. What was missing in this case was any communication between Vinson and Greenwood, or any indication that Vinson asked anybody to get Big Greenwood to circumvent any regulations. Do you understand the concept of willful blindness? I absolutely do, Your Honor. In the law? Absolutely do. And, of course, the Supreme Court in global text said that's more than a negligent standard. It requires this deliberate indifference. Indeed. And to follow up, I think, on what Judge King indicated, the willful blindness in this case largely went to these particulars of what was going on in the banks, if applicable. And if there had been some evidence that Vinson and Greenwood were having lunch and talking about things, or something like that, or Greenwood was getting gifts from Vinson, I think maybe you could infer it. But here, there was next to no contact. And, again, I cannot emphasize enough the words of Greenwood himself, which we put in our sentencing memorandum. I did not conspire with Keith Vinson at all. I just thought he was going to be a good customer for the bank. So, Judge, we don't think, under global text, that the evidence supported the willful blindness here. And that's a discretionary call for the court. I mean, so you're up here on an abuse of discretion. That's correct, Your Honor. That's the standard of review. And I'd just like to conclude. It's a big record. It's a lot of stuff. Quite frankly, this is a case that I've been dreaming about for years, unfortunately. How long did the trial last? A couple of weeks? Well, Judge, I've been involved in this case for many years now. The trial? The trial was a couple of weeks, Judge. That's correct. Of course, it's a situation where you planned it one way, where you thought everybody was going to trial, and the Friday before trial, everybody else falls away and we're there by our lonesome. So that was the setting we were in. But what is missing in this case, going back to why we would contend the evidence wasn't overwhelming and the evidence wasn't even sufficient to send it to the jury, was any evidence that Keith Vinson lied to any bank or banker. His loan guy, Hager, specifically testified. Keith Vinson never asked him to do that. Gorlay at Pisgah? No. No. Keith Vinson, in our brief conversation, never asked us to lie or do anything wrong. There was other evidence to that as well, Your Honor, and we ask that his conviction be reversed. Okay. Thank you very much. Thank you. Sir, you're court-appointed. Is that correct? That is correct, Your Honor. Well, we very much appreciate your efforts on behalf of your client. Thank you very much. We will come down and greet the lawyers and then go directly to the next.
judges: Diana Gribbon Motz, Robert B. King, Allyson K. Duncan